**Opinion filed May 22, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00102-CR

_____

## BLAINE JASON KINSEY, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 13th District Court**

**Navarro County, Texas**

**Trial Court Cause No. 33,117**

### M E M O R A N D U M   O P I N I O N

The jury found Blaine Jason Kinsey guilty of sexual assault and assessed punishment at confinement for ten years and a fine of $10,000. *See* TEX. PENAL CODE ANN. § 22.011 (West 2011). The trial court suspended the imposition of the

sentence and placed Appellant on community supervision for ten years. We affirm.

Appellant raises four issues on appeal but does not challenge the sufficiency of the evidence. Nevertheless, because we find that the trial court erred in the admission of certain evidence, we will review the testimony and evidence in some detail for use in our harm analysis.

S.C. reported that, in the evening hours of May 2, 2010, Appellant sexually assaulted her. S.C. testified that she was twenty-eight years old. She was married, but she and her husband had been separated for five years. S.C. and her husband were the parents of three children; the children lived with their father.

S.C. told the jury that she first met Appellant in April 2010. She was living with her cousin Zach and his wife Amanda at that time. Tim Kristin was Zach and Amanda's next-door neighbor. On the day that Appellant and S.C. first met, S.C. was visiting at Tim's house and Appellant stopped by. The full extent of S.C.'s testimony about the remainder of that evening is that, later in the evening, Appellant gave her his cell phone number and told her that, if she "wanted to hang out or anything[,] that [she] could call him." Contrary to Appellant's description of the events of that first meeting, she, in effect, told the jury that it was not until a few days later that she first went to Appellant's house. She also testified that she never had consensual sex with Appellant.

Appellant's version of what transpired on the night of that first meeting is somewhat different, as are Appellant and S.C.'s versions of what happened between that first meeting in April and their last meeting in the evening hours of May 2, 2010. Appellant testified that at the time of the incident made the basis of this case, he was a paramedic for the City of Mexia. Appellant was divorced. His ex-wife, the mother of his children, had custody of the children, and Appellant had standard visitation rights with them.

The first weekend in April 2010 at the end of a visitation period, Appellant returned the children to their mother around 6:00 or 6:30 in the evening. He testified that after he dropped his children off with their mother, he passed by his friend Tim's house. Tim and a friend, Terry, were sitting outside, and Appellant stopped. While Appellant was there, a young lady came out of Tim's house; she was introduced to Appellant as S.C. They all sat around and visited and drank beer for about one or one and one-half hours. At some point in time, Terry left, Tim had to finish mowing, and Appellant and S.C. continued to visit.

Appellant testified that as he and S.C. were visiting, Appellant asked her whether she wanted to go get something to eat, have drinks, or "even go . . . to my house and watch a movie." According to Appellant, S.C. told him that she had rather go to his house because it would be cheaper on both of them. He walked her to Amanda's house and visited with Amanda and Zach while S.C. went into the house and changed clothes. S.C. came out of the house in about thirty minutes, and they left and went to Appellant's house.

According to Appellant's testimony about that first meeting, when he and S.C. got to his house, they sat outside and drank beer, listened to music, and talked for about an hour. Their conversation advanced from "flirtatious" to sexual. He testified that at one point in time, S.C. looked at him and asked him what was on his mind. He asked her whether she really wanted to know, and when she said that she did, he leaned in and kissed her; she kissed him back. Appellant told the jury that at some point in the conversation that night S.C. told him that she did not wear underwear and that he took that as a sexual advance toward him. They went into the house.

After they went inside, Appellant got some beer from the refrigerator, and they began to watch a movie. About fifteen to twenty minutes into the movie, Appellant said that he and S.C. "started kissing and fondling one another." In the

3

process, he removed her shirt and asked her whether "she wanted to carry this any further? If she wanted to go back to the bedroom and she immediately got up and walked back to my bedroom." They went to the bedroom and removed their clothing, and according to Appellant, he started "performing oral sex on her." Appellant's testimony was that they then "had sex" for thirty-five to forty-five minutes and, after about thirty minutes of conversation, "had sex again." S.C. stopped him during the second time because she thought that he had torn her in the vaginal area. He looked, and they both had some blood on them. They cleaned each other up, got dressed, and returned to the living room; they watched TV for a while and talked. S.C. decided it was time for her to go, and Appellant took her home.

On cross-examination by the State, Appellant testified that he asked S.C. whether it was okay to not wear a condom and that S.C. said it was okay. Contrary to S.C.'s testimony that Appellant gave her his cell number at that first meeting and then left, Appellant told the jury that within two to three hours after he and S.C. first met, they had oral sex as well as consensual sexual intercourse and that he ejaculated into her.

Some few days after that first meeting at Tim's house, according to S.C.'s testimony, she texted Appellant and asked him whether he wanted to go hear Amanda sing; he agreed. S.C. testified that it turned out that Amanda was not going to sing until later that evening and that S.C. and Appellant went to his house to watch a movie and hang out until time for Amanda to sing.

Amanda testified that, on occasion, she would sing in public with a friend. Per arrangements between S.C. and Appellant, Amanda took Appellant and S.C. with her to a place called "Fat Daddy's" in Waxahachie; she was to sing at "Fat Daddy's." According to Appellant, they were there a few hours, drinking beer and listening to people sing, and then they left. Amanda testified that on the way back

4

to her house, they stopped by a Taco Bell to get something to eat; that, when they got back to her house, she went inside; and that Appellant and S.C. stayed outside. Amanda also testified that S.C. came in and asked whether Appellant could come in and hang out a while. Amanda told her that it was too late. S.C. went outside to tell Appellant; he left and S.C. came in.

Appellant's version of the events of the days after their first meeting is that he and S.C. communicated by text message and by phone calls. On April 12, he was at work when S.C. asked him whether he wanted to get together with her the next day, his day off; that was also the day that they were going to hear Amanda sing. He did, and he picked her up around noon that next day. They went to his house to finish watching the movie they had started watching earlier. Appellant testified that they did not have sex that day. After the movie, Appellant and S.C. went to Amanda's house. Appellant, S.C., and Amanda rode in Amanda's vehicle from there to Fat Daddy's in Waxahachie, the place where Amanda was supposed to sing.

There were different versions about what happened after they returned to Amanda's from Fat Daddy's. We have already related Amanda's testimony about the events that occurred after they had returned to her house.

S.C. recalls that the evening ended differently than the testimony from Appellant would indicate. S.C. testified that Appellant asked her to go home with him and also asked whether she wanted to do something else. She told him that she was going inside and going to bed, and that is what she did; he went home.

On the other hand, Appellant testified that, when they arrived at Amanda's house, S.C. asked him to stay outside. He said that S.C. went into the house and that, after about five minutes, she came back out of the house and asked him whether he wanted to spend the night there. Appellant's testimony was that he

5

declined because he had to go to work the next morning and did not have any extra uniforms with him.

Appellant said that he and S.C. continued to communicate by text and by an occasional phone call. About a week before a festival known as "Derrick Days," S.C. contacted him to see if he wanted to go to the festival with her. He declined. Appellant had a girlfriend at the time, and he testified that he was trying to hide from her the fact that he was seeing S.C. He further testified that, for about a week, S.C. did not respond to his calls or to his texts. Later, on April 30, Appellant received a text from S.C. in which she gave him a new cell phone number. They began communicating again.

Appellant testified that on May 2, 2010, he went fishing with his children. They fished until around 3:30 or 4:00 in the afternoon and went back to his house so that the children could clean up and get ready to return home to their mother. S.C. also had gone fishing that day. She was fishing with Zach, Zach's friend Sean Hughes, and Zach's oldest son. Both Appellant and S.C. agree that they texted back and forth quite a bit that day while they were fishing and that they were texting about getting together later after Appellant had taken his children home.

Although they agreed on the language used in the multiple texts exchanged that day, Appellant and S.C. disagreed on the context and on the meaning of the content. In one of the text messages from Appellant to S.C., he gave her some options for their evening together. One of those options was to go for drinks, and the other was: "Or we can just go to my house, get naked and freaky in the bed the rest—or [sic] the night." She responded, "Aww, okay." S.C. testified that the reply to Appellant was a sarcastic one. She intended it to be a message meaning, "Here we go again." S.C. said that Appellant knew what she meant.

S.C. testified that this was not the first time that Appellant had made such comments to her. And, when he had made sexually suggestive remarks to her

6

before, she told Appellant that she was aggravated by those types of remarks. However, when Appellant had made those remarks before, S.C. assumed that he had been drinking or that he was just trying to be funny. Although contested by Appellant, S.C. claimed that, in between those messages, he phoned her to say that he was "just kidding and that he wouldn't do anything like that." She told him on the phone that "it wasn't going to happen" and asked "if he was okay with just having drinks." He also wrote, "I'm just playing with you honestly." She responded, "It's cool." Appellant asked if she was "up for that last idea." She responded, "Whatever. Sure." He testified that "the last idea" referred to the one about getting "naked and freaky in the bed." Appellant also took the "Aww, okay" response to mean that S.C. wanted to have sex because they had already had sex twice. She thought that the "last idea" referred to the fact that they would have drinks. Later, she texted him a "winkie face" emoticon. Appellant concluded that there were at least two consents for sex—three, if one counts the "winkie face."

When Appellant took his children to their mother's house at the end of the visitation on May 2, he knew that S.C. had not yet returned home from the fishing trip. He decided to stay and have dinner with his children, his ex-wife, and her boyfriend, and after dinner, he went to Amanda's house to meet S.C. Later, he went to the lake to pick her up from the place where she was fishing. They went to the Taco Shop to get S.C. something to eat, and then they went to his house to watch a movie.

S.C. testified as to her recollection of the events that took place in the evening hours of May 2 after they arrived at Appellant's house. When they got back to Appellant's house, they went in; Appellant drank some beer and then went to shower. She testified that, while Appellant showered, she watched a movie. When Appellant came out of the shower, he sat down on the couch next to her; she moved away from him. He "scooted" closer to her, and he kissed her. She again

7

moved away from Appellant, and she let him know that she "didn't want that." Appellant became angry and began to yell. He told S.C. that he had taken her "fat f'ing" cousin and her for drinks and had bought them food and that she should kiss him. Appellant finally trapped her between him and the armrest of the sofa. He was on top of her. He had his forearm across the top part of her chest and had one leg on the couch and one leg on the floor; he was trying to get her pants unbuttoned. While Appellant was attempting to unbutton S.C.'s pants, she was saying "no" and trying to get her legs up and in between Appellant and her. She was not able to accomplish that.

Appellant had trouble getting S.C.'s pants unbuttoned—the pants had double buttons—and Appellant got up so that he could get her pants off her. When he got up, he let her go, and she tried to get away. But he grabbed her—at first by her jeans and then by the hair on the back of her head. She was on her knees trying to crawl off the couch. He had already begun to hit her, and as she tried to crawl away, he began to hit her head on the wooden part of the couch. During S.C.'s testimony, she looked at the photo of the couch and living room and made the comment to the jury that a table had been moved, "it was in a different spot" on the night of the alleged assault. In another part of her testimony, she said, "That stuff was not on that couch." S.C. also testified that there had been a blanket on the couch that "was out like . . . he had slept on it or something." She testified that the blanket that was on the couch on the night of the assault was not in the photograph that was taken later by law enforcement personnel.

S.C. said that the next thing she remembered after Appellant hit her head on the wooden part of the couch was that she had been turned over and that he "had had sex with me, and was getting off of me." She had neither her pants nor panties on; they had been removed. Appellant had his penis inside her vagina; she had not consented to that. Appellant got two washcloths, cleaned himself with one, and

8

gave the other one to S.C. for her to use to clean herself.  He used his, but she did not use hers.

S.C. told the jury that she was afraid, "freaking out."  She did not know what he was going to do.  Appellant kept mumbling that he did not know what he was going to do.  She told him that "it was okay" and asked if he would just take her home.  She told him that she "wasn't mad or anything . . . that it was fine."  She said that she just wanted to go home.

According to S.C., Appellant did not want to take her to Zach and Amanda's "because they would know that something had happened."  She could tell that she had blood on her, that she had been injured, and that her shirt had been torn.  She told Appellant that she would just tell everyone that she had fallen.  She was desperate and just wanted to "get out of there" and "get away from him."  She assured him that she would not say anything.  S.C. testified that, after the assault, Appellant threatened her.  He told her what he did for employment and said that it would be a shame if something were to happen to other people who lived in the house.  She took that as a threat that he was capable of carrying out.  She was more afraid than she was in pain.  She finally got him to agree to take her to Hughes's house.

S.C. felt safe with Hughes, a man with whom she had had a one-time sexual encounter and with whom she was now just friends.  This is the same Hughes who was a friend of Zach and Amanda and with whom S.C. had been fishing on the date of the alleged assault.  S.C. testified that she wanted Appellant to drop her off at the corner close to Hughes's house so that she could just run in but that Appellant said he did not want to do that because it would make it look like he had done something wrong.

Appellant's version of the events of that evening was as follows: when S.C. and he arrived at his house, they went in, and he got some beer from the

9

refrigerator. They began to watch the movie, and at some point, they began kissing and "caressing." He told S.C. that he was going to take a shower because he had been fishing all day and was "pretty nasty." There is no testimony that S.C. cleaned up or showered.

Appellant said that he showered, put on a pair of basketball shorts, and returned to the living room. When he came back into the living room, S.C. was lying on the couch and was covered with a brownish-colored blanket that is shown in a photo that the law enforcement officers took of his living room and couch. He uncovered her and started kissing her. He unbuttoned her pants; they "slid her pants off her legs"; and he performed oral sex on her. After that, they had sexual intercourse; he ejaculated into her again.

Appellant told the jury that after they had sexual intercourse, he "wiped [himself] off, and she -- I gave her a rag and she wiped herself off" and that they got dressed and began having a conversation. During the conversation, S.C.'s demeanor changed "a whole bunch," and she seemed sad. She either told him that she was sad because of her grandmother's recent death, or she had told him about the death earlier and he just assumed that was why she was sad. At any rate, Appellant testified that he expressed his sorrow to her.

After twenty-five to thirty minutes, S.C. told him that she wanted Appellant to take her to a friend's house. The friend was going to give her a ride to a new job the following morning. As they drove there, he noticed that she "just wasn't acting right." Appellant told the jury that, when they got to the friend's house, as S.C. got out of his pickup, she leaned in and either hugged him or kissed him and said that she would call him later. It took a while for anyone to come to the door and let S.C. in. Appellant offered to let her use his phone to call and let her friend know she was there (the battery had gone down on her phone). She declined, and in a

short while, someone let her in and Appellant left. He noted that the time on the clock in his pickup was 10:49 p.m. when he let her out. They never spoke again.

S.C. testified that when she and Appellant arrived at Hughes's house, she got out of Appellant's pickup, went to Hughes's door, and began banging on it. Hughes finally came to the door. He had a gun with him when he answered the door; it was "the middle of the night," and Hughes's two children lived with him. According to S.C., when Hughes answered the door, he looked at her and said, "What the hell happened to you?" He wanted to know whether Appellant had hurt her. S.C. told the jury that she was afraid because Hughes still had the gun and Appellant was still sitting in his pickup. Therefore, she told Hughes that she had fallen. As soon as she was inside the house, S.C. locked the door and told Hughes what had happened, that Appellant "did this to [her]."

Hughes would not allow S.C. to take a shower or to clean up. She did, however, change her shirt and wash her face as much as she could until Hughes told her to stop and to call the police.

Hughes testified before the jury. He had known Amanda for about fourteen years. He knew S.C. through Zach and Amanda and had known her for one and one-half to two years. He and S.C. had a one-time sexual encounter.

Around midnight on the night of the offense, Hughes's son woke him up and told him that someone was knocking on the door. When Hughes went to the door and opened it, S.C. was standing there and was covering her face with her hand. When S.C. came into the house, Hughes could see that her face was "pretty bloodied up" and that her shirt was torn. She had blood on her clothes and looked "rough." Hughes told the jury that S.C. "was terrified," "scared." After S.C. told him what had happened, Hughes called Amanda so that Amanda could come and take S.C. to the hospital. S.C. "was bleeding pretty bad." Amanda came and took S.C. to the hospital. Hughes did not see S.C. anymore that night.

Amanda testified that, between 11:00 and 12:00 on the night of the alleged offense, she received a telephone call from Hughes regarding S.C. She said she got dressed and drove to Hughes's house. When she got there, she noticed that S.C. "looked horrible." S.C.'s face was bloody; one side of her face was puffy; her clothes were ripped; "and she was sitting on the couch bawling her eyes out." Amanda made sure that S.C. did not wash anything. Amanda put the shirt that S.C. had worn in a plastic bag and took S.C. to the hospital.

The State introduced the medical records from Navarro Regional Hospital that pertained to the event. Also, Debbie Teague Grant, a registered nurse and certified sexual assault nurse examiner, testified as did Dr. Robert Phillips. Grant was on duty in the emergency room when Amanda brought S.C. in. Dr. Phillips was the emergency room physician on duty at the time. Both Grant and Dr. Phillips detailed the history given to them by S.C. and the bruises, scrapes, contusions, abrasions, and other injuries they found on S.C.'s body. A rape kit was performed. Dr. Phillips testified that the results of the exam could be from a sexual assault or not, but it was his opinion that S.C.'s condition was consistent with the alleged assault. Grant also testified that the examination was consistent with the history of assault given by S.C. and that, based upon what she saw and what S.C. told her, she was of the opinion that this was a sexual assault.

On the night of the alleged assault, Todd Henkel, a patrol deputy for the Navarro County Sheriff's Office, was dispatched to Navarro Regional regarding a sexual assault complaint. He met with S.C. and noted that she had an injury to her lip, an injury to the side of her face, and "bruises to her arms and stuff." S.C. named Appellant as her assailant.

On May 3, 2010, Scott Stephens was working as a detective for the Navarro County Sheriff's Office. He and Detective Sergeant Hank Bailey went to Appellant's house to talk to him about the alleged assault. They knocked on the

12

doors to the house, but no one was there. Through the back door, they could see a laundry basket that contained what appeared to be the washcloths that S.C. had described to them. The officers obtained a search warrant. The following morning, they executed the warrant and also arrested Appellant.

The day after the arrest, Detective Stephens saw S.C. again. She told him that there had been no other sexual encounters with Appellant. She also showed him additional bruises that had just begun to show. Detective Stephens testified that S.C.'s injuries were consistent with the allegations that S.C. had made.

Four days after she was examined at Navarro Regional, she was seen by Dr. Kim Evans, an OB/GYN. Dr. Evans testified that when she first saw S.C., she appeared disheveled, very emotional, and at times tearful. She seemed "appropriately upset" for someone who had made a claim of sexual assault. Dr. Evans described the bruises, lacerations, and scratches that she found "throughout" S.C.'s body. She also found excoriations or scratches to S.C.'s perineum. Even after four days, those scratches were consistent with the sexual assault that S.C. reported. Dr. Evans's assessment was "adult sexual abuse." "The exam findings were -- are highly suggestive of and can be consistent with the alleged sexual assault." Dr. Evans also told the jury that the scrapes to the perineum could be consistent with either consensual or nonconsensual sex.

Appellant called Dr. Tiffany Gabble, an OB/GYN, to testify. She reviewed the medical records from Navarro Regional as well as Dr. Evans's records. Dr. Gabble disagreed with Dr. Phillips's findings, with Grant's findings, and with Dr. Evans's findings. She saw nothing in any of the records that would indicate that a sexual assault had occurred. The injuries in the photographs were superficial; the majority of the bruises were old; and the scratches did not look like assaultive scratches. The injuries to S.C.'s lip, according to Dr. Gabble, were

13

nothing more than classic herpes lesions, which bleed easily. She did not see any excoriations in the photograph of S.C.'s perineum.

Dr. Phillips later testified again. Among other things, he said the injuries that he saw to S.C.'s lip were inconsistent with a herpes outbreak, but consistent with a traumatic injury. There is very little bleeding when a lesion ruptures. Dr. Evans also testified that any herpes involvement was not related to this incident.

Mary Ann Bell, a licensed professional counselor who began treating S.C. in December 2010, testified for the State. Bell explained the symptoms of post-traumatic stress disorder (PTSD) and said that S.C. exhibited many of them, such as difficulty in falling or staying asleep; nightmares and flashbacks; anxiety attacks; increased irritability; exaggerated startle response; fear (often stays in the house with the blinds closed because of fear); avoidance (tries to avoid thinking or talking about the event and keeps herself busy in an effort to do that); difficulty recalling certain aspects of the event; and a numbing of her emotions (if one stays busy, one does not have to feel).

In addition to his own testimony, Appellant presented witnesses who testified to his reputation as a truthful and peaceful person. He also called a witness who testified that S.C. had a reputation as being an untruthful person.

To show that S.C.'s injuries were related to an earlier incident, Appellant introduced Navarro Regional emergency room records from April 20, 2010. On that date, S.C. was attempting to take a picture down from the wall and she fell some five feet from a dresser to the floor. Dr. Phillips compared those records with the injuries found during S.C.'s May 2 emergency room visit. He testified that there was no correlation between the April 20 injuries and the May 2 injuries.

In his first issue, Appellant challenges the trial court's decision to admit evidence that Bell had diagnosed S.C. as suffering from PTSD. Appellant

concedes that "the evidence of the counselor's diagnosis of PTSD was relevant" in this case "because consent was an issue" but argues that it was an abuse of discretion in light of Rule 403 to allow "this prejudicial evidence in this case."

Appellant argues that, because S.C.'s "credibility was the sole issue in this case," Bell's testimony "that [S.C.] was diagnosed with PTSD was extremely prejudicial and was the kind of testimony that was impossible to rebut."

A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). We will uphold a trial court's ruling if it is correct under "any theory of law applicable to the case." *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." TEX. R. EVID. 403. 'Unfair prejudice' does not, of course, mean that the evidence injures the opponent's case—the central point of offering evidence. Rather it refers to 'an undue tendency to suggest decision on an *improper* basis, commonly, though not necessarily, an emotional one.'" *Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993) (quoting Steven Goode et al., *Texas Practice: Guide to the Texas Rules of Evidence: Civil and Criminal* § 403.2 (1988)).

Appellant did not challenge the expert's qualifications at trial, and he does not do so on appeal. The State designated Bell as an expert witness prior to trial, and Appellant took Bell on voir dire outside the presence of the jury. Appellant asked about Bell's experience, her education, and whether she had ever been fired. At the conclusion of the voir dire, Appellant objected "under Rule 403" and argued that Bell's testimony was offered "to put [S.C.'s] testimony up there twice" and that "this is just a way to bring in hearsay evidence and to re-emphasize the

emotional impact of this alleged crime." The trial court overruled the objection and allowed Bell to testify. Appellant obtained a running objection.

According to Bell, PTSD is diagnosed when the following symptoms are present: (1) a life-threatening event; (2) recurrent recollections of the event; (3) persistently avoiding things that trigger memories of the event; and (4) anxiety brought on by thinking about the event. Bell testified that S.C. suffered from PTSD; that, among other things, she suffered from nightmares, anxiety attacks, increased irritability, avoidance issues, and fear; and that these symptoms are consistent with the sexual assault the victim had described. On cross-examination, Bell agreed that she could not say what caused the PTSD but could testify as to the symptoms she observed. Bell admitted that she does not investigate the cause but relies on what the patient tells her. Bell told the jury that she studies the patient's outward appearance and what is happening "on the inside and being familiar with seeing this several times over and over again as far as what really is a symptom and what is not a symptom."

Although relevance has been conceded, we note that Bell's expert testimony was relevant to the issue of consent as circumstantial evidence that S.C. suffered from some kind of trauma. Although Appellant contends that this testimony was "extremely prejudicial," he fails to explain how evidence that the victim suffered from PTSD is *unfairly* prejudicial. By its nature, the evidence against an accused is prejudicial, but to be inadmissible, it must encourage a verdict on an *improper* basis. *See Cohn*, 849 S.W.2d at 820. Appellant also argues that Bell's testimony is "impossible to rebut because an alleged victim cannot be compelled to submit to an examination by a defense expert." However, Appellant fails to explain what he would hope to gain through an additional expert assessment.

We find no basis for the exclusion of this otherwise relevant and admissible expert testimony. Bell did not express an opinion on whether she believed S.C.

16

was telling the truth or whether S.C. could be believed. Bell told the jury what she observed and explained that these symptoms were consistent with trauma based on her experiences with patients suffering from PTSD. Bell also agreed that this was her opinion and conceded that another expert might reach a different conclusion. Her testimony did not cross the line between assisting the trier of fact and attempting to replace the jury's role as decision maker. Accordingly, we cannot conclude that the trial court's decision to admit Bell's testimony was an abuse of discretion. Appellant's first issue is overruled.

In his second issue on appeal, Appellant maintains that certain testimony from Detective Stephens regarding the disposal of a blanket and S.C.'s panties was inadmissible hearsay.

We have noted that S.C. testified that, at the time of the assault, there was a blanket that was out on the couch "like [Appellant] had slept on it or something." At trial, a photograph of Appellant's living room was admitted into evidence. S.C. looked at the photograph and testified that the blanket that was on the couch the night of the assault was not there. The photograph shows two folded blankets on opposite ends of the couch, but S.C. testified that the blanket that was on the couch that night was not in the picture that the officers took later. Appellant testified, however, that the two blankets in the photograph were still at his house on the day of trial and that those were the only blankets that he ever owned. At trial, S.C. was never asked if she knew what happened to that blanket.

During cross-examination of Detective Stephens, defense counsel established that the officers did not find blood in Appellant's pickup, on his couch, or anywhere else in his house. Detective Stephens also agreed that it was not unusual to put a used washcloth in a dirty clothes hamper. After defense counsel established that there was no investigation to determine whether anyone else

17

caused S.C.'s injuries, the following exchange occurred between Appellant's lawyer and Detective Stephens:

> Q. You know, if a guy was covering up a sexual assault would he tend to leave the evidence just lying around?
>
> A. I wouldn't, but, you know, I can't answer for him.
>
> Q. Well, let's say a guy had sexually assaulted a girl and she cleaned herself up with a rag, do you think he just goes, so, okay, we'll just put them in the dirty clothes hamper and wait for the cops to find it. Does that seem normal?
>
> A. Normal, no, but.
>
> Q. Okay. Would it seem normal for, I mean, we've heard testimony that [Appellant], that [Appellant] drove [S.C.] to Sean Hughes's house, and waited there for the light to come on and the door to open so that she could go in the house. Does a guy who just sexually assaulted a girl sit around and wait so somebody can identify his truck?
>
> A. I, you know, I wouldn't, but.
>
> Q. You wouldn't, would you?
>
> A. No.

After Appellant vigorously challenged the evidence as showing nothing more than consensual sex because a guilty person would have tried to hide or clean up any evidence, the State attempted to establish that Appellant had disposed of a certain item of evidence in the case. The State began its redirect examination of Detective Stephens by asking him whether S.C. had told him that there was a blanket covering the couch during the assault. Detective Stephens answered affirmatively. He also testified that S.C. told him that the panties that she wore that night were missing. Detective Stephens testified that the police did not find any women's panties and that "the blanket [S.C.] described to us was not there." The State asked, "What did [she] say the defendant did with the blanket?" Appellant's attorney objected to the question as calling for hearsay. The trial court

18

overruled the objection. Detective Stephens then told the jury that S.C. told him that Appellant put the blanket "in a black trash bag" and that, "when he left the residence, he took it with him and put it in the trunk."[1]

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991). We will reverse a trial court's ruling only if it is outside the "zone of reasonable disagreement." *Id.* With some exceptions and exemptions, an out-of-court statement that is offered to prove the truth of the matter asserted is inadmissible hearsay. TEX. R. EVID. 801(d), 802.

On appeal, the State argues that Appellant "clearly opened the door to hearsay testimony regarding the Appellant removing evidence from the scene of the crime." The State contends that it "was entitled to question the detective about what his investigation turned up regarding the removal of evidence" after Appellant "elicited testimony regarding what a sexual offender may do in the situation." We disagree.

Even if we assume that testimony about whether Appellant had taken steps to dispose of potential evidence was not relevant (which we do not hold because, to the contrary, it was relevant), Appellant's cross-examination of Detective Stephens might have made it relevant. But it did not invite otherwise inadmissible hearsay testimony on that issue. *See Kipp v. State*, 876 S.W.2d 330, 337 (Tex. Crim. App. 1994) ("'Opening the door' or 'inviting' testimony that would otherwise pertain to an inadmissible subject matter does not mean that such testimony is necessarily 'invited' into evidence in *any* form, including hearsay."). As the Fourteenth Court of Appeals has held, relevance and hearsay present different considerations. *Daniels v. State*, 25 S.W.3d 893, 898 (Tex. App.—Houston [14th Dist.] 2000, no

---

[1]The evidence shows that Appellant was driving a pickup. Although the record indicates that S.C. told Detective Stephens that Appellant put the trash bag in the "trunk," we are assuming that "trunk" in the record should actually read "truck."

pet.). The court must view the admissibility of the evidence through two different lenses. First, was the door opened to allow otherwise and theretofore nonrelevant evidence? Second, was the witness testifying from personal knowledge or is there an exception under the rules? *Id.* Here, even if Appellant "opened the door" to make otherwise nonrelevant testimony then relevant, the testimony nevertheless was inadmissible hearsay. The State could have recalled S.C., and she could have testified as to the relevant fact of what she personally observed about the disposal of the blanket; the State did not do that. Instead, the State offered, and the trial court admitted, inadmissible hearsay evidence from Detective Stephens concerning S.C.'s out-of-court statement. The statement was clearly offered to prove the truth of the matter asserted: that Appellant had disposed of the blanket.

We have already noted that Detective Stephens testified that S.C. had told him the panties she wore that night were missing. However, as far as the disposal of any panties by Appellant is concerned, the State's question to Detective Stephens inquired only about the trash bag and the blanket, not about a trash bag and missing panties. After the detective was allowed to testify as to the hearsay statement about what Appellant did with the blanket, Appellant's attorney asked Detective Stephens: "Now let's say that, let's say that a person sexually assaults somebody on a blanket and then gives somebody a rag, a rag to clean up with, does it make any sense that that person would take the, take the trouble to take the blanket and put it in a black trash bag, *and take some underwear and put it in a black trash bag*, but then leave the rags that had been, that the person had cleaned up with just sitting in the hamper?" (emphasis added). Counsel for Appellant continued, "I mean, typically, especially a person *who supposedly had already hidden underwear* and hidden a blanket . . . ." (emphasis added). As we have noted, though S.C. might have told law enforcement officers earlier that Appellant disposed of her panties in a trash bag, neither Detective Stephens nor anyone else

20

had testified to the disposal of S.C.'s panties. The only reference to that came when Appellant's lawyer asked the questions that we have just quoted.

We hold that the trial court erred when it admitted the testimony about the removal of the blanket over Appellant's hearsay objection, but the objectionable testimony did not include any testimony about panties. Having determined that the trial court erred as to the blanket, we must determine whether Appellant was sufficiently harmed by the admission of the hearsay testimony. *See* TEX. R. APP. P. 44.2(b).

The erroneous admission of evidence constitutes nonconstitutional error. *Kirby v. State*, 208 S.W.3d 568, 574 (Tex. App.—Austin 2006, no pet.); *see Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). Nonconstitutional error requires reversal only if it affects the substantial rights of the accused. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011).

When we assess potential harm, our focus is not on whether the outcome of the trial was proper despite the error but, rather, on whether the error had a substantial or injurious effect or influence on the jury's verdict. *Barshaw*, 342 S.W.3d at 93–94. We review the entire record to ascertain the effect or influence of the wrongfully admitted evidence on the verdict. *Id.* at 93; *see Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010) (in conducting harm analysis "we examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence"). We consider all the evidence that was admitted at trial, the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94. We may also consider the jury instructions, the parties' theories of the case, closing

21

arguments, voir dire, and the extent to which the State emphasized the error. *Id.*; *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

We must reverse a conviction for nonconstitutional error if we have "grave doubt" about whether the result of the trial was free from the substantial influence of the error. *Barshaw*, 342 S.W.3d at 94. "'Grave doubt' means that 'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" *Id.* (quoting *Burnett v. State*, 88 S.W.3d 633, 637–38 (Tex. Crim. App. 2002)). "[I]n cases of grave doubt as to harmlessness the [appellant] must win." *Id.* Neither the State nor the appellant has the burden to show harm. Rather, it is our duty as an appellate court, after an appropriate review, to assess harm. *Johnson v. State*, 43 S.W.3d 1, 5 (Tex. Crim. App. 2001).

Appellant argues that, because the jury had to decide whether to believe Appellant or S.C., "the mere suggestion that Appellant disposed of possibly incriminating evidence that might have contained blood could have tipped the scales against Appellant." We agree that the jury was the judge of the credibility of the witnesses and of the weight to be given to their testimony. But here, the jury had many opportunities to exercise that judgment as to S.C. and Appellant and to many other witnesses throughout the trial of this case.

We will use the phrase that many of the cases use and note that this is not the typical "he said, she said" case of sexual assault when the only witnesses are the two parties involved. For example, the court in *Hammer* wrote: "Sexual assault cases are frequently 'he said, she said' trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, unaided by any physical, scientific, or other corroborative evidence." *Hammer v. State*, 296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009). Referring to *Hammer*, the court in *Sandoval* said, "The only direct evidence of the sexual

22

assault was [the alleged victim's] account in her testimony. The State presented no corroborative evidence." *Sandoval v. State*, 409 S.W.3d 259, 290 (Tex. App.— Austin 2013, no pet.).

Although the jury did hear two basically diametrically opposed versions of the event from Appellant and from S.C., those versions were not unaided by physical, scientific, or other corroborative evidence. Here, there were more than twenty witnesses who testified and over eighty exhibits that were admitted for the jury's consideration. In this opinion, we have reviewed in some detail the evidence that the jury heard and do not find it necessary to repeat that evidence here. The inadmissible testimony was but a small part "of a large amount of evidence presented that the jury could have considered in assessing" the parties' credibility. *Schutz v. State*, 63 S.W.3d 442, 446 (Tex. Crim. App. 2001). In our review, "the focus on credibility "is significant, but it is not conclusive." *Id.* When we consider all the evidence that was admitted at trial, the nature of the evidence supporting the verdict, the character of the alleged error, how the evidence might be considered in connection with other evidence in the case, the parties' theories of the case, closing arguments, voir dire, and the extent to which the State emphasized the error, we cannot say that the error had a substantial or injurious effect or influence on the jury's verdict.[2] We do not have "grave doubt" about whether the result of this trial was free from any substantial influence resulting from this one error. We hold that the erroneous admission of the hearsay evidence about the blanket was harmless. Appellant's second issue on appeal is overruled.

---

[2]We do not believe that we may consider in our analysis either affidavits or testimony of a juror offered at the hearing on the motion for new trial in this regard as violating Rule 606(b), discussed more fully later in this opinion. TEX. R. EVID. 606(b). Even if we could, a different result would not be demanded because of the conflicting nature of the proffered testimony at the hearing on the motion for new trial.

Appellant complains in his third issue that the trial court erred when it denied Appellant's motion for new trial based on jury misconduct. He alleges that a juror slept through critical portions of the trial. Appellant argues that, because he had a constitutional right to a fair and impartial trial and because a sleeping juror deprived him of that right, he is entitled to a new trial under Rule 21.3(g). TEX. R. APP. P. 21.3(g).

We review the denial of a motion for new trial for an abuse of discretion. *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). The determination of historical facts and assessment of witness credibility are within the trial court's discretion. *Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000) (citing *Sneed v. State*, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984)). We consider the evidence in the light most favorable to the trial court's ruling. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). Rather than substituting our judgment for that of the factfinder, we must determine whether the trial court's ruling was arbitrary or unreasonable. *Holden*, 201 S.W.3d at 763. We must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Webb*, 232 S.W.3d at 112. A trial court abuses its disretion when it denies a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Holden*, 201 S.W.3d at 763. The party who moves for a new trial has the burden of proving juror misconduct. *Hughes*, 24 S.W.3d at 842.

A mistrial is appropriate in "extreme circumstances" for incurable and highly prejudicial errors. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). If sleep by a juror constitutes such "misconduct that the defendant did not receive a fair and impartial trial," the defendant must be granted a new trial. TEX. R. APP. P. 21.3(g). A new trial "is appropriate only if the defendant was deprived of his Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury." *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir.

2000). Whether a trial court should grant a new trial because of a sleeping juror depends on whether the juror "missed large portions of the trial or [whether] the portions missed were particularly critical." *Freitag*, 230 F.3d at 1023.

At the hearing on the motion for new trial, Appellant called several witnesses. Alternate Juror Janet Barba explained that she sat next to the sleeping juror throughout the trial. Barba testified that she observed the juror with her eyes shut, that her head was nodding, and that she was breathing like a person who was asleep. Barba said that the juror "would snore intermittently and then it would wake her and she would . . . straighten back up and then she would doze off again." When asked whether she remembered "any specific key points that [the juror] was asleep during," Barba said that the juror was asleep "at various times" during the victim's testimony, and she later told the court that "to be asleep during *any* portion of [the testimony] regardless of who is testifying would have been wrong" (emphasis added). Barba agreed that the juror slept through "a large portion" of the trial, but she was never asked to give any other examples of what the juror missed. On cross-examination, Barba admitted that she was not present during deliberations, that she did not know how much of the evidence the juror comprehended or what role the juror played in deliberations, and that she never discussed with the juror what the juror heard and did not hear.

Nancy Harrist, a legal assistant to Appellant's trial counsel, testified that, when she saw the juror during trial, the juror was slumped in her chair with her chin down and her eyes closed. Harrist agreed with Appellant's counsel that the juror appeared to be asleep for a large portion of the trial, but Harrist never explained how often she observed the juror sleeping, how long the juror slept, or what the critical parts were that the juror missed. Harrist also remembered that the trial ended early one day so that the juror could go to a doctor's appointment and agreed that a medical condition could explain her posture during trial. Harrist also

25

admitted that the defense never talked to the juror after trial to determine how much of the evidence the juror comprehended, nor did she talk to the other jurors to determine how much the juror contributed to the deliberation process.

Appellant also called the bailiff and the court coordinator as witnesses. The court coordinator, Melissa Butler, testified that she was in the courtroom sporadically and saw that the juror's "head was down, [and] her eyes were closed." Butler had the opportunity to observe the juror only a couple of times each day; the juror did not appear to be asleep every time. Butler also testified that she remembered the juror going to the doctor one afternoon during the trial. The bailiff, Calvin Gray, testified that the juror "appeared to doze off during the trial several different times." But Gray admitted that he did not know and merely assumed that she was sleeping because her eyes were shut. Gray noticed that the juror appeared to be sleeping on three or four occasions for one to two and one-half minutes at a time. Gray and Butler both testified that the juror was never left sitting in the jury box when the jury was dismissed.

Although it appears from our review of the record that the juror was "nodding off" and "dozing off" during trial, it is not clear how much of the evidence she failed to hear because she was sleeping. Butler only observed the juror a couple of times each day, and Gray only observed her sleeping three or four times over the course of the trial. Although Barba testified that the juror missed a large portion of the trial, Barba did not explain what she believed was a large portion or give an amount of time that the juror was asleep, and as an alternate juror, she was not present during deliberations to know the extent of the juror's participation. We conclude that the record does not establish that the juror missed large portions of the trial. *See Menard v. State*, 193 S.W.3d 55, 60 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (concluding that evidence that a juror sporadically closed his eyes for short periods does not show that the juror missed

26

large portions of the trial). Moreover, Barba informed the trial court and the bailiff that the juror was sleeping, so the trial court was in a position to monitor and observe her attentiveness. *See Dickerson v. State*, 87 S.W.3d 632, 641 (Tex. App.—San Antonio 2002, no pet.) ("The trial court is in the best position to observe the demeanor of the jurors."). We cannot conclude that the trial court's ruling was outside the zone of reasonable disagreement; consequently, we hold that the trial court did not abuse its discretion when it denied Appellant's motion for new trial. Appellant's third issue is overruled.

In his fourth issue on appeal, Appellant asserts that the trial court erroneously denied his motion for new trial based on a second claim of juror misconduct. He alleges that the verdict was not a fair expression of the jurors' opinion because they made "an agreement to exchange a guilty vote for the promise of probation on punishment." Further, Appellant claims that an *Allen*[3] charge given to the jury by the trial court caused a hold-out juror to change his mind from "not guilty" to "guilty. Appellant presented an affidavit that indicated that the juror agreed to change his vote to guilty after the other jurors agreed that Appellant would be granted probation and not be sent to prison. At the hearing on the motion for new trial, Appellant offered a recording of his lawyer's phone conversation with the hold-out juror as well as the testimony of the hold-out juror. The trial court was of the opinion that Rule 606(b) prohibited that testimony. TEX. R. EVID. 606(b). We agree.

We employ a two-part test to determine whether jury misconduct has occurred. First, we must determine whether there was misconduct, and second, we then assess harm. *Schalk v. State*, 767 S.W.2d 441, 454 (Tex. App.—Dallas 1988), *aff'd*, 823 S.W.2d 633 (Tex. Crim. App. 1991).

---

[3]*Allen v. United States*, 164 U.S. 492 (1896).

Allegations of jury misconduct that are predicated upon the jury's consideration of punishment during guilt/innocence deliberations are often improper attempts to "impeach" the verdict by considering the thought processes of the jurors. *Id.* Nonetheless, jurors should consider only the evidence adduced at trial so that a fair and impartial verdict can be reached according to the law free from improper influence from irrelevant and prejudicial matters not relating to guilt, innocence, or punishment. *Id.* Thus, we must first determine whether Appellant was attempting to improperly impeach the jury's verdict or was properly demonstrating jury misconduct.

Rule 606(b), entitled "Inquiry Into Validity of Verdict or Indictment," delineates the following circumstances under which jurors can testify as witnesses:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

TEX. R. EVID. 606(b). Moreover, the Rules of Appellate Procedure mandate that a defendant must be granted a new trial when the verdict has been decided by lot or in a manner other than a fair expression of the jurors' opinion. TEX. R. APP. P. 21.3(c).

Regardless of Rule 21.3(c), Rule 606(b) limits the manner of proof to that other than testimony of a juror. TEX. R. EVID. 606(b); *Hicks v. State*, 15 S.W.3d 626, 630 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd); *Hines v. State*, 3 S.W.3d 618, 621–22 (Tex. App.—Texarkana 1999, pet. ref'd). The rule contains

two exceptions: outside influence and juror qualification. TEX. R. EVID. 606(b). Specifically, an "*Allen* charge" is not an outside influence for purposes of Rule 606(b). *Franks v. State*, 90 S.W.3d 771, 801–02 (Tex. App.—Fort Worth 2002), *pet. ref'd, untimely filed*, 97 S.W.3d 584 (Tex. Crim. App. 2003). Neither of those exceptions is applicable to Appellant's other arguments here.

Appellant urges this court to also consider the constitutionality of Rule 606(b) as applied to this case. That issue has been decided adversely to Appellant's argument. *See Glover v. State*, 110 S.W.3d 549 (Tex. App.—Waco 2003, pet. ref'd).[4]

We have considered all facets of Appellant's fourth issue on appeal, and it is overruled.

The judgment of the trial court is affirmed.

JIM R. WRIGHT

CHIEF JUSTICE

May 22, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

---

[4]This case has been transferred to us from the Tenth Court of Appeals in Waco pursuant to an order of the Texas Supreme Court under the authority of Section 73.001 of the Texas Government Code. TEX. GOV'T CODE ANN. § 73.001 (West 2013). In accordance with Rule 41.3 of the Texas Rules of Appellate Procedure, we are required to follow the precedent of the Waco court. TEX. R. APP. P. 41.3.